IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                  Plaintiff,<br><br>v.<br><br>ANDRE TAYLOR, *et al.*,<br><br>                  Defendants. | Case No. 12-00291-01/20-CR-W-GAF |

## THE GOVERNMENT'S TRIAL BRIEF

The United States submits this Trial Memorandum to provide background and address certain issues the government anticipates may arise during trial.

I. **INTRODUCTION**[1]

Defendant Andre Taylor was the head of a major cocaine and marijuana distribution organization in the Kansas City metropolitan area. A Mexico-based cartel supplied narcotics to his drug trafficking organization. Taylor's relatives and others assisted him in recruiting buyers and arranging sales. His base of operation was in the 2300 block of Hardesty in Kansas City, Missouri, where his family owned three houses next door to each other. Confidential informants participated in numerous controlled buys of narcotics. Many of those buys took place in, around, or outside of the three Taylor houses.

During the investigation, agents were authorized by the court to intercept wire and electronic communications on Andre Taylor's and other's telephones. Many communications refer to drug transactions. In intercepted telephone conversations, Taylor boasted of spending millions buying drugs to sell within the Kansas City area.

---

[1] The information set forth herein are based on evidence that the government reasonably believes will be in evidence at trial.

Based on telephone interceptions, a murder for hire plot came to light during the conspiracy. Two of the defendants who remain for trial (Andre Taylor and Eric Union) are charged with conspiracy to commit murder for hire. The intended victim was Andre Taylor's one-time trusted associate. Andre Taylor is also charged with possessing a machinegun in furtherance of a crime of violence, *i.e.*, in furtherance of the murder for hire plot.

Twenty defendants were indicted in the Second Superseding Indictment. At this point, three remain for trial:

| Defendant[2] | Counts | Statute |
|---|---|---|
| (1) Andre Taylor a/k/a "Dre | 1 | - Conspiracy to distribute powder cocaine, marijuana (21 U.S.C. §§841(a)(1), (b)(1), 846) |
| | 5 | - Aiding and abetting distribution of powder cocaine (21 U.S.C. §§ 841(a)(1), (b)(1)(c)) |
| | 8 | - Conspiracy to commit murder for hire (18 U.S.C. § 1958) |
| | 9 | - Possessing machinegun in furtherance of crime of violence (18 U.S.C. § 924(c)(1)(B)(ii) |
| (16) Eric Union a/k/a "E" | 8 | - Conspiracy to commit murder for hire (18 U.S.C. § 1958) |
| (19) Victor Vickers a/k/a "VV" | 1 | - Conspiracy to distribute powder cocaine, marijuana (21 U.S.C. §§841(a)(1), (b)(1), 846) |

II. **FACTUAL BACKGROUND**

In April 2011, the FBI signed up a Confidential Informant (CS-1) who was willing to share information about who was selling drugs in the Kansas City area. He was also willing to make controlled purchases under FBI supervision. CS-1 completed fourteen controlled purchases of powder cocaine from defendant Andre Taylor and his confederates in 2011 and 2012. Defendant Daniel Howard often acted as the middleman in the drug transactions between

---

[2] Also, there is an allegation of criminal drug forfeiture against all defendants remaining for trial except Eric Union.

CS-1 and Andre Taylor. In total, FBI agents bought 1,016 grams of powder cocaine from Andre Taylor, his relatives, and/or other associates.

On September 27, 2012, search warrants were executed at the three homes owned by the Taylor family at 23rd and Hardesty. Marijuana was seized from all three locations. In addition, on November 30, 2012, defendant Ruben Machiche consented to the search of his truck and trailer in Nebraska. More than 1,000 pounds of marijuana was recovered from the trailer. According to Machiche, this marijuana was intended for delivery to Andre Taylor.

Additional details showing the culpability of these three remaining defendants are summarized below.

**(1) Andre Taylor ("Dre")**

The wiretap investigation of Andre Taylor's three telephones revealed an extensive drug dealing operation involving powder cocaine, high-grade marijuana, and even some heroin. Investigators also identified Taylor's local connection with a Mexico-based supplier. In fact, Andre Taylor's intercepted calls show that he traveled to Mexico to buy drugs for resale within the Kansas City area. The interceptions also reveal how Taylor's relatives and others assisted him with his drug trafficking.

Joshua Hudspeth was a confidential informant who engaged in multiple controlled buys of cocaine supplied by Andre Taylor. Defendant Daniel Howard was the middle-man for these transactions, which typically involved two to four ounces of powder cocaine. The sales price for two ounces was typically $2,100.

The middle-man, defendant Daniel Howard, facilitated nine of the controlled buys of cocaine for which the government will present evidence at trial. Howard obtained the cocaine from Andre Taylor at his residence on Hardesty. Howard said that Andre Taylor was the biggest

cocaine dealer in town and got his supply from the Mexican cartel. He said that Andre Taylor was the "top dog" and the "money man" of the cocaine business.

Defendant Allen Sanchez was recruited by the Mexican suppliers to move from El Paso, Texas to Kansas City to assist with narcotics distribution. Several times, Sanchez stored cocaine and marijuana at his house for Andre Taylor until Taylor instructed him to deliver it to him. Sanchez also stored large sums of cash for Taylor and assisted with getting cash to the Mexican suppliers.

Defendant Darryl Taylor was a leader within the drug trafficking organization and a nephew of Andre Taylor. In intercepted calls, Andre Taylor acknowledged that Darryl Taylor was going to pay their source of supply the requested $10,000 partial payment to ensure the continued shipment of controlled substances. Defendants Darryl Taylor and Robert Taylor traveled to Mexico to facilitate a drug transaction, staying in a condominium with their Mexican drug supplier and his wife. At some point during the stay, Darryl Taylor realized that he was there to serve as "human collateral" to make sure that Andre Taylor paid for the drugs from the Mexican supplier.

Darryl Taylor assisted Andre Taylor with distributing marijuana and cocaine to others. One of Darryl Taylor's regular marijuana customers was defendant Victor Vickers.

Defendant Robert Taylor was Andre Taylor's partner for drug procurement and distribution. Agents intercepted numerous calls between these two in which they talked about suppliers and plotted their strategy to get cocaine. As explained above, Darryl Taylor and Robert Taylor traveled to Mexico to meet with narcotics sources and facilitate Andre Taylor in obtaining drugs. Robert Taylor assisted Andre Taylor in distributing cocaine to some of the other defendants and others.

4

Defendant Marlon Minton was also involved in cocaine dealing in the area. Agents intercepted calls between Andre Taylor and Minton about picking up cocaine during trips to Houston, Texas. Intercepted calls between these two also include Minton's discussion of his method of using two drivers to bring back cocaine and how this was an effective method because the drugs were never with him.

Defendant Gregory Johnson was repeatedly intercepted during the authorized wiretaps of Andre Taylor's telephones. According to Robert Taylor, Johnson was an Andre Taylor associate who sold high-grade marijuana to area drug dealers. In 2011, Andre Taylor fronted Johnson cocaine on two or three occasions.

In November 2012, Nebraska FBI agents arrested defendant Ruben Machiche, who had been driving a truck with 1,000 pounds of marijuana. Machiche later admitted that the marijuana was intended for redistribution in the Kansas City area. Machiche also admitted that he worked for a "big organization" and had delivered marijuana to Kansas City to Andre Taylor seven or eight times, and he had transported $500,000 to $700,000 in U.S. currency to Arizona for these drug shipments.

**(16)  Eric Union "E"**

Defendants Eric Union and Andre Taylor are charged with conspiracy to commit murder for hire. Taylor is Union's uncle. The intended victim was defendant William "Billy" Brown, who used to be Andre Taylor's trusted associate but got on Taylor's bad side by allegedly stealing his drugs and cash. The "hit man" that Union arranged to do the job was defendant Kenneth Vaughn Cooper.

On August 14, 2012, FBI agents intercepted a phone call between Union and Andre Taylor. Taylor mentioned having seen "the dude" and wanting to get the "dude in the morning

5

shift." Union replied that he's going to send "him" (referring to Cooper) "your direction." Taylor responded, "I don't give a fuck who it is if he [is] serious." Later, agents intercepted a phone call between Andre Taylor and Cooper. They agreed to meet. Cooper said, "show me how you wanna do it or let me know exactly how you want to do it."

On August 16, 2012, FBI agents intercepted a call between Cooper and Andre Taylor arranging a meeting, and then FBI surveillance units observed Cooper and Taylor meet and talk. On August 17, 2012, FBI agents intercepted a phone call between Andre Taylor and an unknown male. During the call, Taylor asked the unknown male if he knows "Billy Brown." Taylor described Brown to the unknown male but the unknown male did not know him.

On August 18, 2012, FBI agents intercepted another call between Union and Andre Taylor. During the call, Taylor complained about not getting in touch with the "dude" (referring to Cooper) and said that he (Taylor) was about to do "something really silly." Union told Taylor not to do that and Taylor responded, "it's necessary to kill him."

On August 20, 2012, agents intercepted a call between Andre Taylor and Cooper, during which they discussed the murder and various weapons that could be used and activity at the intended victim's house. Cooper talked about having an AR-15 that fit inside a tennis racquet bag. Cooper also said he "doesn't plan on leaving any ballistics." Taylor asked Cooper to meet him on the following day.

On August 21, 2012, agents intercepted another phone call between Cooper and Andre Taylor. Taylor told Cooper that he (Taylor) had a "hammer" at "23rd and Hardesty" and Cooper said he was going to come and get it. Later during the call Cooper told Taylor that Cooper was outside and Taylor told him to walk to the back.

6

Later that day, Jackson County Sheriff's Deputies arrested Cooper, based on outstanding warrants, while he was a passenger inside a truck driven by Cooper's father. As deputies approached the vehicle they could smell burnt marijuana coming from inside. When the vehicle was searched, deputies recovered a black "Kimber" (firearms manufacturer) case behind the driver's seat, which contained a MAC-10 style homemade .45 caliber firearm and a metal stick magazine with eighteen live rounds of .45 caliber ammunition.

The government will present evidence that the homemade .45 caliber firearm is a "machinegun" within the meaning of 26 U.S.C. § 5845(b), the National Firearms Act. This evidence relates to Count Nine against Andre Taylor and Cooper, *i.e.*, possessing a machinegun in furtherance of a crime of violence.

Dominic Hayes met Eric Union while they were in custody. Union told Hayes that Andre Taylor had solicited his assistance in locating someone to murder "Billy" because he had stolen money and cocaine from Taylor. Union told Hayes that Andre Taylor promised Union a "finder's fee" to locate a hit man, and Union found someone to do the work. Union also told Hayes that if someone stole that much money, he deserved to die.

**(19) Victor Vickers ("VV")**

Defendant Victor Vickers is charged with conspiracy to distribute marijuana. Agents intercepted a number of phone calls between Vickers and Keith Jones. During those conversations, Vickers and Jones discussed drug transactions, including Vickers' commenting on his customer base paying varying amounts for marijuana. Jones told FBI agents that in 2010, he purchased approximately 1,000 pounds of marijuana, and Jones identified two of his larger customers – one being Vickers. Additionally, Joshua Hudspeth and Daniel Howard said that

Vickers has distributed marijuana since 2005.  Defendant Robert Taylor said that Vickers owed Darryl Taylor $10,000 for a previously incurred marijuana debt.

## III. EXPERT WITNESSES

Unless the parties agree to stipulations, the United States anticipates calling two expert witnesses at trial:

**Michael Powell:**  Firearms Enforcement Officer, United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) in Martinsburg, West Virginia.

Mr. Powell will testify that he examined a gun that was recovered in Kansas City, Missouri from defendant Kenneth Vaughn Cooper on August 21, 2012, and that he determined the weapon is a "firearm" as defined in 18 U.S.C. § 921(a)(3)(A), the Gun Control Act of 1968, and a "machinegun" within the meaning of 26 U.S.C. § 5845(b), the National Firearms Act.

**Lucretia J. Weber:**  Contract Chemist/Forensic Specialist, Kansas City, Missouri Police Department, Crime Laboratory-Chemistry Section; formerly a Senior Forensic Chemist with the Drug Enforcement Administration, HIDTA Laboratory in Kansas City, Missouri.

Ms. Weber will testify about her laboratory analysis of certain drugs recovered in this investigation, and her findings regarding those drugs, including their weight and chemical composition.

## IV. LEGAL ISSUES

### a. Authentication of Recordings

Authentication of exhibits is generally governed by Federal Rule of Evidence 901, which provides in pertinent part:

> **(a) In General.**  To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what its proponent claims it is.

**(b) Examples.** The following are examples only – not a complete list – of evidence that satisfies the requirement:

**(1) Testimony of a Witness with Knowledge.** Testimony that an item is what it is claimed to be.

**(5) Opinion About a Voice.** An opinion identifying a person's voice -- whether heard firsthand or through mechanical or electronic transmission or recording – based on hearing the voice at any time under circumstances that connect it with the alleged speaker.[3]

**(6) Evidence About a Telephone Conversation.** For a telephone conversation, evidence that a call was made to the number assigned at the time:
   **(A)** a particular person, if circumstances, including self-identification, show that the person answering was the one called; or
   **(B)** a particular business, if the call was made to a business and the call related to business reasonably transacted over the telephone.

Shortly after the adoption of the Federal Rules of Evidence, the Eighth Circuit decided *United States v. McMillan*, 508 F.2d 101 (8th Cir. 1974),[4] setting out a test for the authentication of tape recordings of conversations. The proper foundation must include evidence that:

(1) the recording was made by a device capable of recording the conversation;

(2) the operator of the device must have been competent;

(3) the recording must be authentic and correct;

(4) no alterations have been made to the recording;

(5) the recording has been preserved;

(6) the speakers in the conversation have been identified; and

---

[3] The Notes of the Advisory Committee on the proposed rules provide: "Since aural voice identification is not a subject of expert testimony, the requisite familiarity may be acquired either before or after the particular speaking which is the subject of the identification, in this respect resembling visual identification of a person rather than identification of handwriting."

[4] Since the adoption of the Federal Rules of Evidence, the Supreme Court has repeatedly held that the Rules supersede common law evidentiary holdings to the contrary. *See, e.g.*, *Bourjaily v. United States*, 483 U.S. 171, 181 (1987). Although *McMillan* was decided shortly after the Rules became effective, it was still prior to many of the Supreme Court's decisions stating that the Rules speak for themselves, and that no additional requirements for admissibility must be met.

9

> (7) the conversation was made voluntarily and in good faith by the speakers without improper inducement.

*Id.* at 104. These requirements far exceed those of Fed. R. Evid. 901, but remain an alternative method of authentication in that *McMillan* has not been explicitly overruled.

Since *McMillan*, the Eighth Circuit has frequently limited its seven-part test to situations in which traditional forms of authentication meeting the test of Rule 901 have been absent. *See, e.g.*, *United States v. Smith*, 591 F.3d 974, 979-80 (8th Cir. 2010) (*McMillan* inapplicable; law enforcement witness who authenticated DVD was the one who recorded it); *United States v. O'Connell*, 841 F.2d 1408, 1419-1422 (8th Cir. 1988) (*McMillan* criteria not subject to "mechanical or wooden application" and "become meaningful only when viewed in light of the facts of a specific case"). The court has, in fact, repeatedly upheld the admission of tapes into evidence where Rule 901's requirements were met, but the *McMillan* requirements were not. *See, e.g., United States v. Roach*, 28 F.3d 729, 733 (8th Cir. 1994) (recording authenticated by a witness to conversation); *Williams v. Butler*, 746 F.2d 431, 441 (8th Cir. 1984) (*McMillan* standards not required when accuracy of recordings was verified by witness who monitored original conversations), *vacated on other grounds*, 475 U.S. 1105 (1986); *United States v. Panas*, 738 F.2d 278, 286 (8th Cir. 1984); *United States v. McGowan,* 706 F.2d 863, 865 (8th Cir. 1983).

### b. Statements of Co-Conspirators

The testimony at trial will include admissions and co-conspirator statements made by defendants to the government's witnesses. This evidence will be relevant and admissible. A statement is not hearsay if it is offered against a party and was made by the party's co-conspirator "during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E); *United States v. Beckman*, 222 F.3d 512, 522 (8th Cir. 2000).

10

To admit a co-conspirator's statement, the government must prove, by a preponderance of the evidence, that: (1) a conspiracy existed; (2) the defendant and declarant were members of the conspiracy; and (3) the statements were made in the course and furtherance of the conspiracy. *Bourjaily v. United States*, 483 U.S. 171 (1987). Co-conspirator statements present no Confrontation Clause violation. *Id.* at 176.

The admissibility of co-conspirator statements is determined by the trial judge, who may consider any relevant evidence, including the statements sought to be admitted. *See United States v. Beckman*, 222 F.3d at 523. The Court need only determine that the conspiracy existed and that the defendant participated in it. Independent inquiry into the reliability of the statement is not required. *United States v. Causor-Serrato*, 234 F.3d 384, 389 (8th Cir. 2000).

The language "during and in furtherance of the conspiracy" has been afforded a broad construction under Rule 801(d)(2)(E). *United States v. Alcantar,* 271 F.3d 731, 739-40 (8th Cir. 2001); *see also United States v. Jordan*, 260 F.3d 930, 933 (8th Cir. 2001). The statement need not be necessary to the conspiracy nor does it actually have to further the conspiracy. *See United States v. Hamilton,* 689 F.2d 1262, 1270 (6th Cir. 1982); *United States v. Patton*, 594 F.2d 444, 447 (5th Cir. 1979). Statements establishing the identity, intent, or motives of co-conspirators (and thus, of the conspiracy) meet the "in furtherance" requirement, as do statements whose overall effect is to "solidify" the conspiracy. *See United States v. Escobar*, 50 F.3d 1414, 1422-23 (8th Cir. 1995); *United States v. Leisure*, 844 F.2d 1347, 1361-62 (8th Cir. 1988).

At the close of the case, it is the recommended procedure that the trial court make findings that: (1) based both upon the statements of the co-conspirators and independent evidence, a conspiracy existed; (2) the declarants were members of the conspiracy; and (3) the statements were made during and in furtherance of the conspiracy. Thus, the trial court should

11

"admit conditionally the hearsay statements of alleged co-conspirators, subject to a final on-the-record ruling that the statement is admissible under the co-conspirator exception to the rule against hearsay." *United States v. Coco*, 926 F.2d 759, 761 (8th Cir. 1991).

### c. Witness Impeachment Issues

Federal Rule of Evidence 608(b) governs evidence that goes to a witness's character for truthfulness or untruthfulness. It provides in pertinent part:

> Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of: (1) the witness; or (2) another witness whose character the witness being cross-examined has testified about.

The purpose of the rule is to "avoid holding mini-trials on peripherally related or irrelevant matters." *United States v. Martz*, 964 F.2d 787, 789 (8th Cir. 1992).

The Eighth Circuit has emphasized the rule's plain language, to the effect that while a party may inquire of a witness concerning matters which go to the witness's character for truthfulness, the examiner may not thereafter seek to impeach the witness's answer with extrinsic evidence, but must take the answer of the witness. *See United States v. Swanson*, 9 F.3d 1354, 1358 (8th Cir. 1993); *United States v. Johnson*, 968 F.2d 765, 766-767 (8th Cir. 1992); *United States v. Capozzi*, 883 F.2d 608 (8th Cir. 1989).

Another evidentiary rule, Federal Rule of Evidence 613, governs witness's prior statements:

> (a) **Showing or Disclosing the Statement During Examination.** When examining a witness about the witness's prior statement, a party need not show it or disclose its contents to the witness. But the party must, on request, show it or disclose its contents to an adverse party's attorney.

12

> (b) **Extrinsic Evidence of a Prior Inconsistent Statement.** Extrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the about it, or if justice so requires. . . .

"Rule 613(b) addresses situations where a witness makes two irreconcilable statements, one at trial and one previously." *United States v. Bolzer*, 367 F.3d 1032, 1038 (8th Cir. 2004). Regarding Rule 613(b), the Eighth Circuit also requires that the extrinsic evidence of a prior inconsistent statement must be "material to the substantive issues of the case." *United States v. Allen*, 540 F.3d 821, 826 (8th Cir. 2008); *Bolzer*, 367 F.3d at 1038 ("the subject of the prior inconsistent statement must be material").

Thus, the Eighth Circuit goes beyond Rule 613(b) to restrict a party's ability to use evidence of a prior inconsistent statement: "[O]ur case law adds a restriction not explicitly included Rule 613 itself: Extrinsic evidence of a collateral matter is not admissible." *United States v. Cowling*, 648 F.3d 690, 697 (8th Cir. 2011) (quoting *United States v. Carter*, 410 F.3d 1017, 1022 (8th Cir. 2005)). "A matter is collateral 'if the facts referred to in the statement could not be shown in evidence for any purpose independent of the contradiction.'" *United States v. Bordeaux,* 570 F.3d 1041, 1051-52 (8th Cir. 2009) (quoting *United States v. Roulette*, 75 F.3d 418, 423 (8th Cir. 1996)). Simply because the prior inconsistent statement reflects on the witness's credibility does not make it material and non-collateral. "Whether a matter is material or collateral depends on the subject of the testimony. *Id.* at 1051 (referring to the "precise subject" of the prior inconsistent statement). Moreover, the evidence of a prior inconsistent statement is still subject to the Rule 403 balancing test. *See United States v. Demery*, 674 F.3d 776, 780 (8th Cir. 2011).

13

We respectfully request that, prior to engaging in any impeachment which might be of questionable relevance, and prior to offering any extrinsic evidence whatsoever for impeachment purposes, counsel for defendants be instructed to alert the Court in a bench conference so that such a matter may be resolved outside the hearing of the jury.

### d. **Impeachment by Prior Conviction**[5]

With respect to any of the government's cooperating witnesses with criminal convictions, the government requests that the Court direct defense counsel to limit cross-examination of these witnesses to the general nature of the charge, the range of punishment, the sentence imposed, and the fact that the witness hopes to receive a lesser sentence by cooperating. *See United States v. Baldenegro-Valdez,* 703 F.3d 1117, 1123 (8th Cir. 2013). Allowing cross-examination beyond that will lead to "a mini-trial on irrelevant collateral matters." *Id.* To inquire further would be to relitigate the prior conviction which would be confusing, collateral and unfair. *See United States v. Street*, 548 F.3d 618, 627 (8th Cir. 2008).

### e. **Conspiracy to Commit Murder for Hire**

The Eighth Circuit has explained that 18 U.S.C. § 1958, the murder for hire statute:

> is relatively straightforward, both in what it prohibits and in what it does not reach. It does not prohibit murder or attempted murder. Instead, it outlaws using interstate-commerce facilities with the intent that murder-for-hire be committed. Once the interstate-commerce facility is used with the required intent the crime is complete. One who travels or causes another to travel in interstate commerce with the necessary murderous intent need not do anything else to violate the statute.

*United States v. Delpit*, 94 F.3d 1134, 1149 (8th Cir. 1996). "It is clear, moreover, that a defendant can violate § 1958(a) without actually hurting or killing anyone, because the statute provides for enhanced punishment when death or injury results from the defendant's violation of

---

[5] The government incorporates by reference the Government's Response to Andre Taylor's Motion for Order to Allow Use of All Prior Convictions for the Purpose of Impeachment of Witnesses (Dkt. 435).

the statute." *United States v. Young,* 753 F.3d 757, 785 (8th Cir. 2014) (Kelly, J., concurring) (quoting from the "clear legislative history" that "the offense is complete whether or not the murder is carried out or even attempted"). Furthermore, "one can also be convicted, of course, for conspiring or aiding and abetting in connection with this offense." *Delpit,* 94 F.3d at 1149.

### f. Possessing a Machinegun in Furtherance of a Crime of Violence

In Count Nine, Andre Taylor is charged with violating 18 U.S.C. § 924(c)(1)(B)(ii) by possessing a machinegun in furtherance of a crime of violence. The underlying crime of violence here is Taylor's conspiring to commit murder for hire, as alleged in Count Eight. The Eighth Circuit Judicial Committee on Model Instructions' Notes on Use provide that the definition of "machinegun" may be "rather technical and not necessarily intuitive." *See* Notes on Use 6.18.924C(1). Accordingly, the government will present expert testimony on this issue. The Committee also stated that the "question of whether the crime is a crime of violence . . . is question of law for the court" and the court should make its finding on the record. *See id.* (4).

In the Notes on Use, the Committee stated its belief that "'knowingly' is required even though section 924(c) does not expressly require that the act be done knowingly." *Id.* (5). Furthermore, the Committee stated its belief that "actual knowledge of the specific characteristics of the firearm resulting in enhancement of the punishment is not required in an 18 U.S.C. § 924(c) prosecution." *Id.* (6).

### g. Lesser included Offense Instruction

A defendant may be found guilty of "an offense necessarily included in the offense charged." Fed. R. Crim. P. 31(c)(1). Eighth Circuit law on this issue is well-settled. A defendant is entitled to a lesser included offense instruction only if, among other things, "the proof on the element or elements differentiating the two crimes [the greater and lesser offenses]

15

is sufficiently in dispute so that the jury may consistently find the defendant innocent of the greater and guilty of the lesser included offense." *United States v. Elk*, 658 F.2d 644, 648 (8th Cir. 1981) (quoting *United States v. King*, 616 F.2d 1034, 1043 (8th Cir. 1974)); *see also United States v. Ponce*, 703 F.3d 1129, 1132 (8th Cir. 2013). "Moreover, it is beyond dispute that a defendant is not entitled to a lesser-included offense instruction unless the evidence adduced at trial provides a rational basis upon which the jury could find him not guilty of the greater but guilty of the lesser offense." *Elk*, 658 F.2d at 648.

Regarding narcotics offenses, a lesser included offense instruction is "properly refused when the defendant possessed quantities exponentially greater than the user amount." *United States v. Jangula*, 735 F.3d 1054, 1057 (8th Cir. 2013) (quoting *United States v. Gentry*, 555 F.3d 659, 667 (8th Cir. 2009)). Another factor the court looks at on the issue of "distributor versus user" is the purity of the narcotics. *See United States v. Santoyo-Torres*, 518 F.3d 620, 624 (8th Cir. 2008); *United States v. Dodd*, 473 F.3d 873, 876-77 (8th Cir. 2007). Moreover, a lesser included offense on simple possession is not proper unless there is "evidence the defendant intended merely to use the drugs that he or she possessed, rather than to distribute the drugs." *Jangula*, 735 F.3d at 1057; *see also Gentry*, 555 F.3d at 667 ("In this context, courts have looked for evidence that the defendant is a user or may have intended to use the controlled substance."). A defendant who proclaims innocence or lack of involvement with the narcotics is not entitled to a lesser included offense instruction. *See United States v. Knox*, 634 F.3d 461, 464 (8th Cir. 2011) ("Generally, we affirm a district judge's refusal to instruct the jury on a lesser-included offense when the defendant claimed complete innocence throughout trial.").

    h. **Buyer-Seller Instruction**

A jury instruction that a mere buyer-seller relationship is not sufficient to support a drug

conspiracy may not be given unless it is supported by the evidence. *See United States v. Johnson*, 719 F.3d 660, 671 (8th Cir. 2013). A buyer-seller instruction "is not supported by the evidence and thus 'not appropriate when there is evidence of multiple drug transactions, as opposed to a single, isolated sale.'" *Id.* (quoting *United States v. Hester*, 140 F.3d 753, 757 (8th Cir. 1998) (quoting *United States v. Wiggins*, 104 F.3d 174, 177 (8th Cir. 1997))). Where the defendant's "participation in the conspiracy spanned years, with multiple drug transactions and multiple customers," the buyer-seller instruction is not supported by the evidence. *United States v. Tillman*, 2014 U.S. App. LEXIS 16526, *6 (8th Cir. Aug. 27, 2014). "Because it was not a single, isolated sale, the buyer-seller instruction was not supported by the evidence." *Id.*

### i. Prior Consistent Statements

Federal Rule of Evidence 801(d)(1)(B) provides that prior statements by a witness are not hearsay if they meet certain requirements. The Eighth Circuit has held that a statement is admissible under this Rule if: (1) the declarant testifies at trial and is subject to cross-examination; and (2) the statement offered is consistent with the declarant's trial testimony, and was made prior to the alleged fabrication, or prior to the motive or influence which is alleged to have improperly resulted in the "fabricated" testimony. *United States v. Red Feather*, 865 F.2d 169, 171 (8th Cir. 1989); *United States v. Bowman*, 798 F.2d 333, 337-339 (8th Cir. 1986).

If a party contends at trial that a witness's testimony is the result of the witness's discussions or negotiations with the authorities, evidence that the witness made similar statements to others prior to contacts with the authorities logically rebuts the allegations of false testimony, and specifically addresses the precise type of express or implied charge against the declarant of recent fabrication or improper motive referred to by the rule. *See United States v. Barrett*, 937 F.2d 1346 (8th Cir. 1991).

17

The rule itself is not one providing "exceptions" to the general rule against hearsay; Rule 801(d) instead provides that such statements are not hearsay. Accordingly, such a statement can be utilized as substantive evidence, and the jury may be so instructed. *Tome v. United States,* 513 U.S. 150 (1995); *United States v. White*, 11 F.3d 1446, 1450 (8th Cir. 1993).

### j. Summary Charts and Timelines

The Eighth Circuit has explained that "[t]he admissibility of summary charts, graphs, and exhibits 'rests within the sound discretion of the trial judge, whose action in allowing their use may not be disturbed by an appellate court except for an abuse of discretion.'" *United States v. Green*, 428 F.3d 1131, 1134 (8th Cir. 2005) (quoting *United States v. King*, 616 F.2d 1034, 1041 (8th Cir. 1980)).

Federal Rule of Evidence 1006 permits a party to use a summary or chart at trial if its requirements are met. Summaries charts have been permitted in numerous cases. *See, e.g., United States v. Boesen*, 541 F.3d at 848 (summary of clinic billings); *United States v. Green*, 428 F.3d at 1133 (summaries of records from SBC Communication and Dell Computers); *United States v. Wainright*, 351 F.3d at 820 (summaries of logging activities and bank records); *United States v. Possick*, 849 F.2d at 339 (summaries of drug transactions and volume of phone calls, flow chart of organization).

In *United States v. Green*, the Eighth Circuit explained that Rule 1006 summary charts can be treated as evidence and provided to the jury during deliberations. However, the court should issue a limiting instruction. 428 F.3d at 1133; *see also* 8th Cir. Crim. Jury Instr. § 4.12.

In addition, Federal Rule of Evidence 611(a) also supports the admission of summary charts and timelines. Rule 611(a) provides that the court should exercise reasonable control over the mode of presenting evidence so as to, among other things, make the procedures effective for

determining the truth, and avoid wasting time. The use of a pedagogic aid, such as a time line, can further these goals. The Eighth Circuit has explained that "[v]isual aids that summarize other evidence are generally permissible pedagogic devices, especially when used to organize complex testimony or transactions for the jury." *United States v. Crockett*, 49 F.3d 1357, 1360-61 (8th Cir. 1995). Aids such as time lines should be permitted as long as they are not "unfair and misleading" but are "straightforward and accurate." *United States v. Possick*, 849 F.2d at 339.

### k. Installment Witness Testimony

To coherently present some of its trial evidence, the government may seek leave of Court to present the testimony of some witnesses in installments. Fed. R. Evid. 611 provides that the trial court, "should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth, (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment."

The Eighth Circuit has repeatedly upheld the repeated recalling of witnesses in complex criminal cases where the witness provided installment or count-by-count testimony and the defendant has a full and fair opportunity to cross-examine the witness. *See United States v. Puckett*, 147 F.3d 765, 770 (8th Cir. 1998); *United States v. DeLuna*, 763 F.2d 897, 911-12 (8th Cir. 1985)

Here, the government's proof deals with numerous separate incidents, several crime locations, and spans several years. If the government waited until the end of its case to call each witness who repeatedly responded to these locations and/or tested evidence, the jury would be

19

presented with a confusing jumble of evidence, with little hope of correlating the numerous exhibits to the proper event or count of the indictment.[6]

V. **CONCLUSION**

The government will provide more information and address any additional issues identified by the Court before or during trial.

>
> Respectfully submitted,
>
> Tammy Dickinson
> United States Attorney
>
> By    */s/ Lucinda S. Woolery*
> Stefan C. Hughes #40239
> Lucinda S. Woolery #36625
> Assistant United States Attorneys
>
> Charles Evans Whittaker Courthouse
> 400 East 9th Street, Fifth Floor
> Kansas City, Missouri 64106
> Telephone: (816) 426-3122

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing was filed on this 29th day of August 2014, by electronic notice on those parties having entered their appearance under the Electronic Filing System (ECF).

>
> */s/ Lucinda S. Woolery*
> Lucinda S. Woolery
> Assistant United States Attorney

---

[6] When the government presents evidence through the repeated recall of a witness, the trial court should make the defendant choose between withholding all cross-examination until the end of the witness' testimony, or limiting cross examination at the end of each installment to the subject of the installment. *See United States v. Jackson*, 549 F.2d 517, 528 (8th Cir. 1977); *see also United States v. Graham*, 83 F.2d 1466, 1474 (D.C. Cir. 1996).